YELYERTON, Judge.
These consolidated cases involve a single vehicle accident which resulted in the death of the driver, Jack Maxwell. The defendant in both suits, the State of Louisiana, through the Department of Transportation & Development (DOTD), appealed from the trial court’s determination that DOTD was 30 percent at fault in causing the accident, and from the calculation of the damage awards to Sheila and Carol Maxwell. The plaintiffs in these consolidated suits are the widow of the deceased, Carol Maxwell, and the deceased’s former wife, Sheila Maxwell, who brought suit in her capacity as tutrix of the minor child, Donald Maxwell, as well as her two major children, Jack, Jr. and Shelly. In their answer to the defendant’s appeal the plaintiffs contend that the trial court erred in its finding that the deceased was 70 percent at fault in causing the accident, and that the trial court erred in not awarding damages for the pain and suffering of the deceased.
We affirm the trial court judgment in both cases as to all issues presented on appeal for the reasons given below, and we today render a separate judgment in the other consolidated case of Maxwell v. State of Louisiana, through the Department of Transportation & Development, 496 So.2d 690 (La.App. 3rd Cir.1986).
Concerning the issues of causation and the percentages of fault, the trial judge who decided this case wrote excellent and extensive reasons for judgment. After a careful study of the record and the exhibits, we find that the trial court’s findings are correct and its resolution of the case is proper. We adopt the trial court’s reasons for judgment as our own opinion in this case. We set forth these reasons for judgment as follows:
“On May 2, 1982 Jack Maxwell was traveling in a westerly direction on La. Highway 92 between Youngsville and Milton, Louisiana. Maxwell lost control of the vehicle which he was operating, a 1981 Dat-sun 280-Z, in an ‘S’ curve on La. Highway 92 and ultimately collided with a Gulf States utility pole number 184 and a South Central Bell telephone box located approximately 400 feet beyond the curve and ten feet six inches from the edge of Highway 92. The pole and box were located on the opposite side of a drainage ditch which runs along the northern edge of said highway. Jack Maxwell died as a result of the injuries he received in the accident.
“Maxwell, age 42 at the time of his death, was succeeded by his widow, Carol Maxwell, and three children of his prior marriage, Jack Maxwell, Jr. and Shelly Maxwell, both majors, and Donald Champion Maxwell, a 12 year old minor. The decedent owned and operated American *683 Auto Sales, Inc., a used car dealership, and the Datsun was one of the many cars on decedent’s lot. On the day in question Maxwell attended the Breaux Bridge Crawfish Festival and was en route to a barbeque at a friend’s house when the accident occurred.
“On the trial of the matter State Trooper Joyce Thibodeaux, who investigated the accident, stated the posted speed was 45 m.p.h. and that the 55 m.p.h. speed she had written on her police report the day of the accident was an error on her part. The weather was clear and warm, the road was dry. She noted that the road was being resurfaced but that the road surface was in excellent condition and, in her opinion, was not a contributing cause of the accident. Trooper Thibodeaux did not observe any construction barricades or signs at the accident scene. Thibodeaux did observe yaw marks on the road surface. These are turning marks instead of the straight marks made by skid marks. (Photos 19-21) Trooper Thibodeaux stated the car was a late model 280 ZX. The tire appeared to be in good condition and that car problems didn’t seem to have caused the accident.
“Upon her arrival at the hospital she learned Maxwell had been declared dead. At this time she requested the emergency room nurse to draw a blood sample to test for possible blood alcohol levels. She explained that this is a routine request, made at every accident of this type, to aid in determining or eliminating possible causes of an accident. The nurse was unsure if a good sample could be drawn but did as she was requested. Trooper Thibodeaux never received a follow-up report and assumed the sample was not good.
“Mrs. Cynthia Landry, an eyewitness to the accident and who occupied a vehicle traveling in an easterly direction along La. Highway 92, testified that she stopped her vehicle (Point L on aerial photo) when she saw Maxwell exit the curve out of control (Point Y on aerial photo). She stated his two right tires were 1 to 2 feet on the shoulder and dust and gravel were flying. He came back onto the highway into her lane for a few feet, swerved back to the other side of the highway, went off the road and hit the inside of the ditch. The car then flipped and hit a utility pole and a telephone box. As a result of the impact the utility pole was broken in half and the telephone box was severely damaged. (Joint Exhibit 1, 4, 11, 12). Decedent traveled approximately 400 feet out of control. When Mrs. Landry realized Maxwell was coming into her lane, she put her car in reverse and backed it up (Point L on aerial photo).
“She stated Maxwell’s car did not spin around. His speed was fast in relation to her speed.
“Mrs. Landry is familiar with this road as she drives it often. She considers the curve dangerous. She drove the curve at 40 to 45 m.p.h. She was aware of the resurfacing activities on the road but did not see any barricades or construction signs.
“The second eyewitness to the accident was Patricia Bouillion who lives on Highway 92. Upon hearing tires screeching on the blacktop she came around the side of her father’s house to see a car out of control (Point B on aerial photo). As she put it ‘the car was going a little fast and a little out of control’. This was about half way between her father’s house and the curve. The car was half off the shoulder then crossed into the east bound lane, returned to the west bound lane, spun completely around 3 to 5 times, began to roll over 3 to 4 times then hit the pole.
“She saw no construction signs. She stated she knew they were up at one time but was unsure if they were there on the day of the accident. She stated this is a bad curve and that she usually traveled it at 25 m.p.h.
“Her testimony differs from Mrs. Landry’s in that she claims the car spun around. Landry said specifically it did not spin and [Bouillion said] that the car flipped 3 to 5 times [while] Landry said it [flipped] once before hitting the pole. Mrs. Bouillion did not seem as sure about her *684 recollection of the events as did Mrs. Landry.
“Carl and Monica Trahan, friends of the Maxwells, went to the accident scene. Mr. Trahan saw no.road construction signs or any big yellow curve signs. Both testified that there was a big drop off where the asphalt had been laid. Mrs. Trahan said the drop off was ‘severe’ estimating it at 4 to 5 inches. She also stated there was no striped lines on the edge of the black top.
“The three experts that testified all agreed that the curve was dangerous. The critical speeds for the curves (maximum to maintain control) were 51.2 m.p.h. to 52 m.p.h. for the right hand curve and 56.8 m.p.h. to 58.2 m.p.h. for the left hand curve. Two of the experts, Paul Wright and Olin Dart, estimated the design speeds (negotiated with comfort) were 27.6 to 81.5 for this area. Mr. Dart observed yaw marks on the road which he said are caused by a car negotiating a curve at a high rate of speed. The resistance of the tires on the road leaves the marks. Dwayne Evans ran a ball bank test to measure the deflection on side of a vehicle to determine an advisory speed on a curve. The result was 25 m.p.h. recommended speed.
“All agreed the curves were too close together and that the aggravating factors of minimum superelevation and the degree of curvature add to the dangerous condition. Dr. Wright calculated a 16 degree curvature for the left hand curve and a 20 degree curvature for the right hand curve. Dr. Dart calculated 15.7 degree and 20.3 degree curvatures. Dr. Wright testified that more than a 6 degree curvature poses a problem for drivers.
“Dr. Evans testified that at the end of the curve the shoulder was three inches lower than the pavement and that the shoulder material was a little loose. He did not use the word ‘drop off. Dr. Wright in his general observations of the road found that it was recently paved. The shoulders were incomplete and a ‘drop off' did exist. Dr. Wright recommended extraordinary signals to get a driver’s attention especially considering the straight approach to the curves that may lull a driver into the idea the alignment would continue. Dr. Dart stated the only reasonable explanation for the car leaving the road the way it did (other than the driver was inattentive or missteered) was that the driver was at the maximum (critical) speed in negotiating the first curve and remained at that speed entering the second curve. This would have caused the right tires to go off the road about 2 feet as they did in this case.
“Dr. Dart suggested flashing lights as a possible alternate warning at the curve but was satisfied that those in existence now were sufficient (advisory speed and curve signs).
“The issues faced by the Court are:
“(1) Whether the state was guilty of any negligence in maintaining the roadway that caused or contributed to the accident?
“(2) Whether plaintiff was guilty of any negligence that caused or contributed to the accident?
“(3) Whether both the plaintiff and the State of Louisiana were guilty of negligence that combined to cause the accident?
“At the time of the accident the Highway Department was resurfacing Highway 92 in a project that included the area between Youngsville and Milton.
“According to the testimony of Alfred Fusilier, a construction engineer with the Department for 28 years, construction signs were installed. According to Defendant’s Exhibit 3 there was a large ‘Length of Construction Sign’ sign at Youngsville on Hwy. 92 which read ‘Road Construction — next 5 miles’. The speed limit of 45 was posted intermittently along Hwy. 92.
“An inspection was made periodically during the project to insure these signs were in place. Daily diary records of 4/30/82 and 5/3/82 reflect all signs and barricades were in place. In fact, on the day after the accident a special sign inspection was made to check what signs were up. The report shows all signs were in place.
*685 “From the testimony of several of the witnesses, including two of the experts, a drop off did exist although there was some discrepancy as to the depth of said drop off.
“Mrs. Monica Trahan testified that according to her observations on the day of the accident the drop off was ‘severe’ estimating it to be four to five inches. Dr. Evans testified at the end of the curve the shoulder was three inches lower than the pavement. He did not specifically use the word ‘drop off’. Dr. Wright noted a ‘drop off’ but did not give an estimate of its depth. According to the testimony of Alfred Fusilier the roadcrew, in resurfacing the road, first scarified the roadway from ditch to ditch. This leveled the highway and shoulders. The crew then laid 1½ inches of ‘hot mix’ on the road surface only. This was the extent of the work that had been done at the time of the accident. He then estimated the drop off was 1½ inches at the time of the accident. The crew was to eventually put a second layer of ‘hot mix’ on the road surface and then bring shoulders to grade in order to complete the project.
“Mr. Fusilier’s testimony as to the depth of the drop off is the most accurate, substantiated as it is by the procedure for resurfacing he outlined. Fusilier’s testimony does not conflict with Dr. Evans’ if, as Fusilier explained, the work crew did indeed put a second 1½ inch layer of ‘hot mix’ in completion of the road resurfacing project.
“DUTY OF THE STATE
“The Department of Highways has a duty to maintain safe highways. Rue vs. State, Department of Highways, 372 So.2d 1197 (La.1979); Sinitiere vs. Lavergne, 391 So.2d 821 (La.1980).
“In Sinitiere the Supreme Court stated, ‘the Department is not a guarantor of the safety of travelers but, rather owes a duty to keep the highways and its shoulders reasonably safe for non-negligent motorists. Liability based upon negligence is imposed when the Department is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time.
“ ‘Since road shoulders are only designed for temporary use when a motorist finds himself off the roadway, the Department’s duty of care is generally discharged at a level of construction and maintenance less than that required for the primary road surface. However, an implicit necessity for the functional use of a shoulder is a connection between the roadway and the shoulder that allows for safe gradual movement from one to the other.’
“In Rue, supra the Supreme Court stated that a motorist’s duty to drive reasonably does not extend to the risk of injury from striking an unexpected and unexpectable hazard resulting from a negligently maintained highway shoulder. The reason for this statement was the jurisprudentially recognized rule that a motorist has a right to assume that highway shoulders are maintained in a reasonably safe manner in the absence of knowledge or reason to know of a defect. This language does not establish the highway shoulder as a ‘zone of recovery’ for every straying motorist. Rather it states the simple principle that the law will not automatically bar a person from recovery or charge him with liability vis-a-vis third parties where the law does not charge that person with actual or constructive knowledge of an avoidable danger.
“In Rue the Supreme Court held that the duty of the Department to maintain safe highway shoulders imposed an obligation to protect against the inadvertance or substandard conduct of drivers who thereby found themselves traveling on the shoulder.
“In the later case of Sinitiere, supra the Supreme Court held that the duty is not imposed to protect a motorist against a shoulder defect of which he has full knowledge and a reasonable opportunity to avoid.
“Specifically in relation to the duty to properly sign a highway, the Supreme Court in Vervik vs. State, Department of Highways, 302 So.2d 895 (La.1974) stated, *686 ‘reasonable care requires, and the Department does owe a duty to the traveling public to erect barricades, signs, and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions, or defects in the road ... Whether the warning is required, reasonable, or adequate is determined by the place where the danger exists, the nature of the road and the general situation and circumstances surrounding it. All of the facts, together with the kind and speed of vehicles, are to be taken into consideration to determine whether the Department has discharged its duty ...’
“In Pickens vs. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975) the Supreme Court noted that there is no fixed rule for determining what is a dangerous defect in a public way; that the facts and circumstances in each particular case control. The test to be applied is as follows: ‘Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence.’
“According to Mr. Fusilier’s testimony after the entire road surface had been scarified from ditch to ditch only the travel portion of the roadway had been overlaid with 1 ¼ [sic] inches of ‘hot mix’. He stated the shoulders would be graded after the second layer of ‘hot mix’ had been applied. The work on the shoulder was therefore incomplete at the time of the accident. Even considering the lower standard for maintenance of a shoulder as outlined in Sinitiere the condition of the shoulder was not up to standard.
“Maxwell’s speeding could be termed ‘substandard conduct’ which caused him to deviate from the roadway onto the shoulder but at this point the Highway Department, according to the decision in Rue, supra, was under a duty to protect him from further harm. Mrs. Landry’s testimony concerning the dust and gravel she saw flying as Maxwell exited the road is an important indication of the instability of the road surface.
“There were warning signs placed at the beginning of the project but these were, in the opinion of this Court, insufficient to warn Maxwell of this possible danger in order to allow him to reduce his speed in accordance with the prevailing conditions.
“According to the standard recited in Sinitiere, supra this dropoff and shoulder did not provide a connection that allowed for a safe gradual movement from the roadway to the shoulder.
“In determining the duty of the Department to maintain reasonably safe highway shoulders, the Court in Sinitiere, supra relied on the guidelines prepared by the Department and which are followed by DOTD. The guidelines state that ‘more than a one (1) inch drop should not be allowed’. The extent of the instability of the shoulder material and depth of the drop off was not in the opinion of the Court immediately apparent to drivers, using the roadway, even considering the signing that was present.
“The State was under a duty to warn of this particular hazard by signs that were available to the Department at the time of the accident, e.g. ‘Shoulder Work’ ‘Low Shoulder’.
“Testimony at trial established the fact that Maxwell had rarely if ever traveled this road. This fact combined with the absence of an obvious danger and insufficient signing by the State indicating the shoulder condition leads the Court to conclude that Plaintiff cannot be imputed with full knowledge of the condition of the shoulder. In the absence of such knowledge and opportunity (to avoid the danger), the motorist is entitled to assume a highway shoulder is maintained in a reasonably safe condition and that his unintentional or negligent deviation onto it will not lead to disastrous [consequences]. Under the prevailing conditions the State was under a duty to warn of the possible hazardous condition of the shoulder which existed while the resurfacing project was underway.
“ ‘Liability based on negligence is imposed when the DOTD is actually or constructively aware of a hazardous condition *687 and fails to take corrective action within a reasonable time.' Sinitiere, supra.
“The Department knew of the condition resulting from its highway resurfacing project. The Department could have expediently corrected the situation during the project and prior to the accident by proper signing. The Department was negligent in not taking these corrective measures.
“Negligence is only actionable where it is both a cause in fact of the injury complained of and a legal cause of such injury. Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character. Dixie Drive It Yourself System vs. American Beverage Co. [242 La. 471], 137 So.2d 298 (La.1962); Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973). Using a ‘but for’ test to determine cause in fact results in a finding that the accident would not have occurred if either the road shoulder had been substantially even with the travel portion of the road and the shoulder had been more stable or if the State had provided proper signing to warn drivers of this potential danger.
“PLAINTIFF NEGLIGENCE
“The three expert witnesses estimated the critical speed (maximum to negotiate successfully) for the first curve encountered by plaintiff as between 56.8 to 58.2 m.p.h. and 51.2 to 52 m.p.h. for the second curve. Dr. Dart testified that if a driver were negotiating the first at the critical speed and enters the second curve at that same speed the right front tire would exit the road about two feet at about the same point plaintiff’s tires did. Mrs. Landry testified that she was familiar with the road, having traveled it often and that she usually drove the curve in question at 40 m.p.h. Mrs. Landry then stated that plaintiff’s car appeared to be going fast in relation to her vehicle and that gravel and dust were flying. Ms. Bouillion testified that plaintiff’s car was going a little fast and a little out of control. Additionally, State Trooper Thibo-deaux testified that she observed yaw marks at the accident which indicated plaintiff’s vehicle had made a curving maneuver at a high rate of speed. The speed limit on Highway 92 was 45 m.p.h. The curve the plaintiff was negotiating at the time of the accident had a posted advisory speed of 25 m.p.h.
“The preponderance of the evidence establishes that the plaintiff was driving in excess of 45 m.p.h.
“ ‘A motorist may not drive at a speed faster than that which is reasonable and prudent, consistent with the width and service of the roadway and other conditions ... ’ LSA-R.S. 32:64 subdiv. A, Sibley vs. Menard, 398 So.2d 590, (La.App. 1st Cir. 1980) writ denied. ‘A driver traveling at a speed of between 45 m.p.h. and 50 m.p.h. in a 45 m.p.h. speed zone is negligent in operating his vehicle.’ Naquin vs. Callais, 191 So.2d 885 (La.App. 1st Cir.1966). In addition, as was stated in Kentzel Truck Lines, Inc. vs. State Farm Insurance, 342 So.2d 1133 (La.App. 1st Cir.1977), ‘Signs on a highway indicating reasonable speeds at which curves are to be negotiated are not placed on highways for ornamental purposes and may be used as evidence of the negligence of a driver who negotiates a curve in excess of this suggested speed.’
“A motorist owes a duty of reasonable care which encompasses the additional duties of keeping his vehicle under control and maintaining a proper lookout for hazards that are plainly visible to those exercising ordinary care and observation. Sinitiere vs. Lavergne, 391 So.2d 821 (La.1980); Edwards vs. State, Department of Transportation and Development, 403 So.2d 109 (La.App. 3rd Cir.1981).
“Our jurisprudence recognizes, however, that the speed of a vehicle will not constitute contributory negligence unless it be causally connected with the accident. The rule is stated in Cone vs. Smith, 76 So.2d 46 (La.App. 2d Cir.1954), ‘Negligence alone in the operation of a motor vehicle does not give rise to a cause of action; in order to be actionable the negligence must result in injury or damage and then liability may only be imposed if such negligence is the, or a proximate cause of injury; that is to *688 say — the injury must be the natural and probable consequence of a negligent act or omission, which an ordinarily prudent man ought reasonably to have foreseen might probably result in injury.’
“On the day of the accident plaintiff had driven west on La. Hwy. 92 from Breaux Bridge. The day was clear and dry. He was able to observe that the road was relatively narrow and had been recently resurfaced as part of an ongoing road construction project (as indicated by the road construction sign posted near Youngsville). The shoulders were of a loose gravel material. He could also observe 45 m.p.h. speed limit signs and a 25 m.p.h. advisory speed sign as he approached the curve in question. Considering the requirements of LSA-R.S. 32:64A that a motorist not drive at a speed faster [than] that which is reasonable and prudent, consistent with the width and surface conditions of the roadway and other conditions Mr. Maxwell’s driving was substandard under the circumstances. According to the testimony of Dr. Olin Dart the presence of yaw marks and the manner in which plaintiff’s car exited the highway indicated he was speeding. The Court, therefore, concludes that Jack Maxwell did breach the duty of reasonable care owed himself at the time he exceeded the state speed limits, which caused him to exit onto the shoulder of the road. The Court also finds that the plaintiff’s operation of his vehicle, despite his lack of knowledge of any dangerous conditions, was unreasonable.
“Applying a ‘but for’ test to plaintiff’s conduct results in a finding that his actions substantially contributed to the accident. It is clear that Plaintiff would have been able to safely negotiate the curve in question if he had gone either the advisory speed or the speed limit.
“The Court finds that the negligence of both the plaintiff and the defendant contributed substantially to this accident. The plaintiff’s negligence consists of his driving at an excessive rate of speed, and failing to maintain control of his vehicle. The State’s negligence consists of its failure to properly maintain the highway i.e. to properly sign the construction area to warn of possible hazards.
“Once plaintiff left the travel portion of the highway, due to his negligence, the prevailing road conditions, which resulted from defendant’s negligence and of which plaintiff had no warning, substantially contributed to the outcome. Under these circumstances, the Court concludes that the State is 30 percent negligent and Maxwell’s negligence was 70 percent Therefor Maxwell’s recovery of damages must be reduced by 70 percent. LSA-C.C. Art. 2323.”
The defendant also contends that the trial court erred in its determination and calculations as to the amount for loss of support in favor of Carol and Donald Maxwell.
The trial court in its reasons for judgment made the following factual determinations:
“LOSS OF SUPPORT
“Donald Cornwell, economic expert, averaged the decedent’s income over the years from 1977 through 1981 at $31,735.23. He discounted his findings of future loss of wages at 7.8 percent. In his opinion, the sum of $72,572.12 represented the loss of income from the date of death until the date of trial. His finding of economic loss from the date of trial to the end of his life work expectancy amounted to the sum of $389,794.63. He, therefore, concluded that the total loss of income from the date of death to the end of the work life expectancy amounted to the sum of $462,366.75.
“The factors to be weighed in determining the amount due for loss of support includes the decedent’s earnings at the time of his death, his age and life expectancy, his work life expectancy, the possibility of an increase or decrease in his earnings, the decedent’s income security, the nature of his work, his health, his relationship with his family, his personal expenses and his past work record. Other factors are the age and health of the surviving spouse, the minor children’s ages and the effects of inflation and the need to discount future earnings to a present day value. In short, *689 all factors relevant to a determination of the amount of loss of support due to the premature demise of the decedent should be considered.
“Damages for loss of support cannot be calculated with mathematical certainty. The duty of the court in such cases is to exercise sound judicial discretion and award an amount which, considering all the circumstances, seems just to both parties and is not unduly oppressive to either.
“In determining awards for loss of support, the courts have a duty to fix such awards by giving appropriate consideration to the deflated value of our currency while at the same time discounting the future income stream to its present value.
“In the present case decedent and his second wife Georgie Carol Maxwell were married on December 24, 1981. Mrs. Maxwell testified that Mr. Maxwell supported her, her children from a prior marriage and his children from his first marriage. She testified that she worked part-time when they were first married and she earned $55.00 a day during this time.
“At the time of his death, Maxwell was 42 years old and his wife was 35 years old. Maxwell had a work life expectancy at his death of 18.20 years.
“At the time of the accident Jack Maxwell, Jr. was 19 years old. The second child, Shelly was one month shy of 18 years old. These two children would not be entitled to a claim for loss of support. The youngest child Donald Maxwell, was 12 years old at the time of his father’s death. The youngest child would be entitled to $50,000.00 for loss of support. This award reduced by the 70 percent negligence of Jack Maxwell, amounts to $15,000.00. This award is due Sheila Maxwell, as tutrix of the minor child.
“Mrs. Maxwell is entitled to $412,366.75 which represents the present value of economic loss as projected by Donald W. Corn-well minus the award of $50,000.00 to Donald Maxwell for loss of support. This award is to be reduced by the degree of negligence of decedent, Jack Maxwell. The award would then total $123,710.03.”
After examining the entire record we find no manifest error in these factual determinations. Canter v. Koehring Company, 283 So.2d 716 (La.1973). This was an extremely dangerous reverse curve that was inadequately signed. Additionally, there was no appropriate warning of the under-construction condition of the shoulders. The failure to provide adequate warning signs was a substantial cause of the accident. The defendant is liable under both negligence and strict liability. The deceased’s negligence was also a substantial cause of the accident. We find no error in the trial court’s assessment of comparative percentages of 30 percent to the state and 70 percent to the deceased.
The plaintiffs contend that the trial court erred in failing to make an award for pain and suffering of the deceased from the time of the accident until his death. We disagree.
The only evidence presented at trial showed that the deceased was knocked unconscious by the accident and remained in that condition until he died approximately one to two hours later. We conclude under these circumstances, plaintiffs failed to show entitlement to damages for pain and suffering. See Daniels v. Conn, 382 So.2d 945 (La.1980).
For the reasons above the judgment of the trial court is affirmed in all respects. Half the appellate costs shall be paid by plaintiffs and half by defendant.
AFFIRMED.